The Gorilla Glue, Mr. Jones. Thank you, Your Honor. May it please the Court, I'm Neal Jones, and I represent J.B. Weld. And Your Honor, I have to comment first on something that I'll get to later in this discussion, but I'm so glad that you called this the glue case right before the break, because that's actually one of the issues today. This is really an epoxy case. That was inadvertent. I was just focusing on not calling it a sticky issue, and now you've learned that. Your Honor, you'd be correct about the sticky issue as well. Anyway, I'll get to that argument about materiality of epoxy later. I'll just, let me just put this out there for you. Trade dress is not something that my life is centered around and that sort of thing, because I like hard rules of law, rules of law where you can algebraic functions. Best I understand, trade dress is you look at the two products and it gets some of all the circumstances and that sort of thing, right? The blue brief has the two products here, and I will confess to you that sometime in the past, my wife has sent me to Home Depot or Lowe's or one of the box stores and told me to get some real good glue, and I purchased one of these, but I couldn't tell you if my life depended on it, which one it was, other than it was probably the least expensive one or the lesser expensive one. But that's where I'm coming from, so you need, as far as my vote's concerned, to tell me what I'm supposed to do other than look at these two packages. Yes, Your Honor, and you're right. There is no bright line test for trade dress infringement. It's a balancing of factors, and it's not a tally up how many factors are on this side of the chart and how many factors on this side of the chart, and the one with the most points wins. And the most striking thing about this packaging is the V-shaped deal. How functional it is or non-functional it is, how related to function is another matter. You're right, Your Honor, and that issue is not addressed by the district court, and it's not raised here on appeal, so functionality is not an issue for appeal. What is an issue for appeal is, with respect to the trade dress infringement claim, the two issues that I want to discuss are the actual confusion evidence that the district court disregarded and also the defendant's intent. Now, you talked about or you mentioned looking at the products themselves. Well, Your Honor, that is only half of the confusion analysis. The statute here provides for both product confusion and what we call affiliation confusion. If you look at the Lanham Act, 15 U.S.C. 1125, it has two different types of confusion. It has, are the products designed or the trade dresses of the products confusing as to who the affiliation, connection, or association between two companies. What I call the middlemen had that, but there's not necessarily evidence that the consumers had it. Well, we don't have any evidence here, Your Honor, that actual consumers were confused, but we don't need that because the affiliation evidence that we have is the strongest evidence in this case. Think about it, Your Honor, the two people who were confused and what the court, what the district court actually found is interesting. The district court said that there were inquiries about a possible collaboration. Well, Your Honor, that is per se, per se affiliation confusion. The ConAgra case from this circuit. Yeah, but it's not on behalf of consumers. Your Honor, and it doesn't have to be on behalf of consumers. But kind of lurking is this question, y'all not poor. Why didn't you do a survey to determine whether it was confusing to consumers or not? Your Honor, we didn't have to do a survey. We had to. I assume from the way you're answering, we didn't have to. There's kind of implication maybe you did, but that's not in the record. No, we didn't do, we didn't do a survey because we had this additional evidence. The case law does not require for a trade dress. Wouldn't you have been so much better off if you had evidence of consumer survey that there was confusion? Well, certainly, Your Honor, we wouldn't be here on this issue of actual confusion if we had a survey that said that. But you didn't do it. No, Your Honor, we didn't do it. And that's the factor we ought to be able to consider in this amorphous totality of circumstances. No, Your Honor, that is a factor you cannot consider. And the case law is really clear that the absence of a survey does not mean that there is no confusion. There's a binding Eleventh Circuit decision on that point. Yes, Your Honor. I don't remember which one it is, but I'll find it for you and let you know what it is. But there's a, there's, I think it's Eleventh Circuit now that you've asked me, but I am The lack of a survey is not required to prove likelihood of confusion. So anyway, Your Honor, here, the affiliation confusion. I know it's not required, but the fact that you didn't do one is a factor that can be considered. That's two different things. You know that. Yes, Your Honor. I understand, but I believe that there is binding case law that says you cannot infer from the lack of a survey that there is no confusion. And I may not have that case with it today, and if I don't, I'll submit it as supplementation after the oral argument today. But with respect to the affiliation confusion, Your Honor, it comes from the very best people that affiliation confusion could come from. And I say that because the two persons who were confused were the people who were most knowledgeable about this industry, most knowledgeable about the players. They're... Yeah, but they buy how many tubes a year themselves? Maybe the most knowledgeable ones aren't the ones to measure confusion on. I mean, that's implicit in your brief, but I'm not sure that's accurate. Your Honor, O'Reilly's Auto Parts buys thousands, if not millions, of JB Weld original. I know that, but they don't buy it to use it in their home. They don't have other things. They don't, as one expert testified, aren't in a position of not giving a whit about it so long as it sticks two things together. Your Honor, that's correct. But that's not the standard here. If you look at the ConAgra case, the language from the ConAgra case says, and I'm quoting, that inquiries about affiliation, including from suppliers, distributors, and people in the industry, are, quote, the most persuasive proof of likely confusion, close quote. That's the so-called middleman case. That's what's present here. Now, I'm sure that Gorilla Glue is going to argue that in all the cases where actual confusion has been found, there's some evidence of consumer confusion, of purchasing consumer confusion. But that's the question, Your Honor, for the jury. The jury, it's the jury's role as the fact finder to balance everything, to consider the evidence, and decide whether or not our proof, our evidence of actual confusion rises to the level of showing affiliation confusion. And if so, then that's one of the multiple factors that goes into deciding whether or not this trade dress is infringing. And, of course, in ConAgra, you also had the consumer's confusion. Absolutely. I said that, Your Honor. I'm sure Gorilla Glue is going to argue that. But that's the jury question, whether or not it is, whether, you said yourself, Your Honor, that there is no bright line test on trade dress infringement. Likewise, there is no bright line statement from any court in this circuit that says you have to have consumers who are confused in order for there to be actual confusion or for there to be a likelihood of confusion. There's no case that says that. Now, the other important prong of trade dress infringement that I want to discuss is the defendant's intent. This case record is replete with the intent of Gorilla Glue in trying to trade off the reputation and derive a benefit from J.B. Wells' market-leading product and its reputation. These are words that are used by Gorilla Glue employees in their documents. J.B. Wells didn't make these words up. The words they use are mimic and mirror. They tried to mimic and mirror the J.B. Wells trade dress. It wasn't as clear as I thought it should have been what role those employees who authored those emails had in making the decision about the actual trade dress. They were the people who actually were in charge of designing the trade dress. They were responsible. The people who used the word mirror and mimic, she was the designer. I don't know that she actually did the drawings, etc., but she was in charge of developing the package. They considered over 40 different designs. In fact, one Gorilla Glue employee called the package a knockoff. The court didn't mention that in her order, but a Gorilla Glue employee who was a customer representative for Loctite, I believe it was Loctite, actually called this product such a knockoff. Now, Your Honor, they reached that knockoff status after considering 40 different designs. The design that they chose was the one that was closest. to the J.B. Wells trade dress. And Your Honor, I'll just close my opening with a quote from the Ambrick case. This is what this court said in Ambrick. Even an intent to come as close as the law will allow is an intent to derive benefit from the other party's reputation and is therefore probative on the likelihood of confusion. That's from Ambrick. That's exactly what Gorilla Glue did here. They came as close as possible. In fact, their instructions were... Thank you, Counsel. Ms. Bessel? Thank you. Counsel, Mr. Jones, you've got four minutes in reply, of course. Good morning, Your Honor. May it please the court, my name is April Bessel and I'm here on behalf of the appellee, the Gorilla Glue Company. I'd like to dive right into the trade dress case and the claims at issue here and the analysis. Those emails are pretty damning, aren't they? There is one email, Your Honor, where an employee who is not an executive did colloquially refer to the Gorilla Weld product as a knockoff. There's absolutely no context for this statement and tellingly... But there were other emails that are consistent with that, are there not? No, the other things that were referred to by J.B. Weld were self-evaluations submitted by young women who worked at Gorilla Glue in marketing, where they not only stated they attempted to mirror. And again, the standard here in the 11th Circuit is that it is not the intent to compete. We're not out to protect competitors, we're out to protect consumers. It's an intent to deceive consumers. And those self-evaluations... Which is probative of whether consumers will be deceived. Yes, of course. And the actual statements in the self-evaluation state that they wanted to mirror. They wanted to mirror common and functional elements of the packaging, but they wanted to maintain the Gorilla Glue brand standards. They wanted to have that bright orange coloring that is a hallmark of Gorilla Glue and the giant Gorilla Glue logo. And they did that. They kept that consistent. Why did they want to mirror the other aspects of that? The testimony is quite clear from executives that as they are entering into a new category, they look at exactly what the existing products in the category are doing, so that they match what consumers come to expect. And so when they looked at that V-shape, as Your Honor mentioned, they realized that that clearly conveys that this is not a multi... It's not one glue where you have three in one pack. This is a resin and a hardener that you mix together. But this mirroring, whether it's in marketing or the one person who was not an executive who said it was a knockoff, why isn't... This is a summary judgment case. Why isn't that evidence enough to send this to the jury? When you examine the intent factors, you are looking at a number of different facts, but it can be decided as a matter of law. And when you are looking at it, you need to look at the totality of the factors. It needs to be in the context of the totality of the factors, including the overall packaging design. And there is no better evidence that Gorilla Glue had absolutely no intent to deceive than by the fact that they designed their packaging to look like all of the other Gorilla Glue packaging with the logo. And I'll point here to the Vital Farms v. American Body Buildings Products case out of the Southern District of Florida, where in that case it held that any argument that the defendant had intended to trade off the goodwill of the plaintiff, that that was weakened by the fact that they had prominently placed their eagle logo on two locations on the product. Here on Gorilla Glue, we not only had the giant gorilla that dominates the entire package, you also have the gorilla on the tubes themselves. So in that case, the Southern District of Florida noted the fact that public policy favors allowing competitors to imitate the product of their competitors and found that intent had been weakened by the prominent placement of the logos. They even noted in that case, just as we have here, that the products were of similar size and shape, and they were sold together on shelves, but there was still no likelihood of confusion. That's exactly what we have here, Your Honor. Let me ask you this. It is not just the angle of the tubes, and I understand the argument about function, but if you look in the center of the packaging, you have the disclosure of or specification of the strength, the set time, the cure time, and the cure color in exactly that order. Why is that not too close for comfort when combined with the other factors? So those are factual, those are, sorry, let me take a step back. Those are just facts regarding the products themselves, safety, or features. But I'm talking about the order in which the facts are disclosed on the packaging. Yeah. So that's, yes, Your Honor, that is one element of the entire packaging. This circuit, the 11th Circuit mandates that you must consider the whole of the packaging. You cannot just look at the packaging. So that counts against you? That, yes, Your Honor, that could potentially count against us, but it's outweighed by the packaging as a whole. You need to look at the two products together as they've been displayed in numerous briefs and decide whether or not, as a whole, the packaging is confusingly similar. Was this the first time Gorilla, in this product, that Gorilla used the word weld? Yes, Your Honor. I believe in the whole of its product catalog. This is the first time they used weld. To, again, connote the welding of the resin and the hardener together to weld metal or whatever you're trying to bond together. But it also does, it says Gorilla Weld at the top, above the two tubes, just as it says JB Weld. Yes. Although one is angled, but... Yes. And those are two separate marks. And I should note Gorilla Glue has been registered by the U.S. Trademark Office as a valid trademark despite the presence of JB Weld's registrations. Gorilla Weld is? Correct. Okay. Yes. I do want to go back to the discussion on actual confusion. First off, I do want to note, as we stated in our briefs, there is one survey on actual confusion. It is under the Real case. It is the standard form of evidence on actual confusion. And the only survey here is Gorilla Glue's survey, which found a zero percent net level of confusion for actual consumers. But drawing inferences in favor of JB Weld, as the district court did, they considered these alleged instances of confusion by a competitor, Loctite, and by a retailer, O'Reilly's, which was immediately upon introduction of the product into the market. When you look at actual confusion under the Florida Board of University case in this court, you have to look at who was confused, how many instances of confusion, and the nature of the confusion. So the district court considered this alleged statement that there was affiliation confusion. They did consider that it was not consumer confusion, which, again, consumer confusion is the standard, and that is the most important type of confusion. What the district court held was the nature of the inquiry, the nature of the confusion it issued demonstrated that they weren't confused. They understood they were two separate products. This is just like the case that this court issued in 2017, Superior Consulting v. Shakely. In that case, you had actual consumers, so we're not talking about a competitor or retailer. You had actual consumers who thought the defendant had bought the plaintiff or that the two companies had merged based on the similarity of the marks. And in that case, this court held that that was not evidence of confusion because the consumers knew the difference between the two. And other circuits have similarly held. Nora Beveridge's case out of the Second Circuit held that inquiries as to the relationship between the parties, that that is premised upon a lack of confusion. That's exactly what we have here. The Eighth Circuit in the Duluth News Tribune case held that isolated instances upon the defendant's introduction into the market was insufficient to establish a genuine issue of material fact unlikely to confusion. That is also key because these instances that the appellant has put forth in this case as this evidence of confusion which should overcome the vast dissimilarities in the packaging and Gorilla Glue's 0% net confusion survey, those all happen at a trade show in October and September, the September-October timeframe of 2017 when this product was introduced. So you're talking about very short-lived confusion where the inquiries themselves demonstrate they had no belief of a connection between the two. And that is negated, again, by the survey and everything else when you balance the factors. So turning to, Your Honors, if I can jump forward to the false advertising claim. So J.B. Weld has not only attempted to claim that the packagings themselves are similar under trade dress, they've also attacked Gorilla Glue's use of the phrase steel bond epoxy. And in fact, as Your Honors know, there is a five-pronged test that a plaintiff must meet in order to establish false advertising. In this case, the district court focused on the summary judgment decision on materiality. So that is what it is, the issue before the appeal. Now J.B. Weld has claimed that in order to establish materiality, it need only demonstrate that steel bond and epoxy are inherent characteristics or qualities and they rely upon the Johnson and Johnson VisionCare V1-800 Contacts case for this holding. However, what the 11th Circuit, this court held in that case, was that depending on the facts, it may on its own establish that there is indeed, that the deception alleged here is material just based on the deception itself. And I think a great example of this is actually in a case relied upon by J.B. Weld, which is the cashmere and camel hair case versus Saks Fifth Avenue. And in that case, the defendant was purporting to sell cashmere products, but they were using recycled fibers. And as a result of this misrepresentation, they weren't using pure cashmere. Basically everything that you pay a lot of money for cashmere, the texture, the quality, the characteristics of cashmere, you didn't get it because they were recycled fibers. So by the inherent nature of that deception that they used recycled rather than pure cashmere, you weren't getting what was being advertised. And that's not the case here. Here we have the statement steel bond epoxy. Now J.B. Weld has maintained since December of 2017, when they filed their second amended complaint and added this false advertising claim, that the deception here is that the Gorillabald product is not an epoxy ring chemistry, but it is a methyl methacrylate chemistry, an MMA for short. And they've also claimed that steel bond is a deception because Gorillaweld does not contain steel inside the product. Now when you actually look at the record evidence as a whole, it demonstrates that that alleged deception is not the message that consumers are taking away. Unlike in cashmere, they're getting exactly what's advertised. It's a two-part adhesive that forms a strong bond. The record evidence on steel bond includes a survey by Gorilla Glue's expert Hal Perret in which he asked consumers what they believed steel bond meant. And there were several options. Eighty-seven percent of respondents selected that it either meant it was a strong bond or that it bonded well to steel. Only ten percent believed that it had anything to do with the fact that steel was included in the product. Does, are either one of them, well, is there any evidence about whether inclusion of steel in the product adds anything to it? No, Your Honor. There has been some expert analysis where there are competing expert reports as to whether or not it provides any reinforcement, which goes to the still-live counterclaim before the district court brought by Gorilla Glue as to J.B. Weld's use of steel reinforced on the packaging. And in our testing that we submitted through our expert, it does indeed show that there is no reinforcing being done, but there was nothing that specifically went to whether or not steel in the product does anything aside from that. So turning to the epoxy, let me ask you on materiality. So you're arguing that the term epoxy is not material to packaging, and yet it is included on the packaging, not MMA. Isn't there an argument that by virtue of the fact that Gorilla Glue has in fact included the term epoxy on its packaging, that it's in fact material to consumers? Excellent question, Your Honor, and I'll answer that twofold. I would say first, the survey submitted by Gorilla Glue, which actually got at the heart of the materiality question for epoxy, they submitted to the respondents two images, one where it said steel bond epoxy and one where it said steel bond adhesive. Respondents had equal interest in the product regardless of whether it said epoxy or adhesive. And so that demonstrates that that is not material, the use of epoxy there is not material to the purchase. However, with respect to the use of epoxy and whether or not the actual use of it does indeed demonstrate that it's material in Gorilla Glue's eyes, epoxy as it is understood by the industry and by consumers means a two-part adhesive. If you look at the record evidence, there are numerous ways that you see this. First, market reports all consider two-part adhesives to be epoxies. The retailers group all products that are two-part adhesives together. That includes not only where they're two tubes, but they're a syringe product, so where you actually like push the syringe into where you're trying to bond it and the two products automatically mix together. So those are all grouped together and called epoxy under the heading. If you look at the record, that includes pages 180 to 228 of the Gorilla Glue appendix, and then 278 of the Gorilla Glue appendix. Their survey expert on the issue of false advertising also testified that a majority of consumers understand epoxy to mean a resin and a hardener that mix together in a two-part system. So by using epoxy, Gorilla Glue only intended to convey exactly what it's delivering. It is a two-part product with a resin and a hardener that delivers a strong bond when mixed together. I should also note that even one of JB Weld's own products is grouped together into the epoxy ring chemistry JB Weld claims is required to avoid the deception, and that's its plastic bond or urethane-based product that is sold with epoxies. So as I see my time is coming to an end, I will just note briefly, there is one last claim that JB Weld has appealed here, and that is a Georgia state-based dilution claim. And JB Weld's sole argument is that the district court improperly required it to show likelihood of confusion, that the district court somehow held it was necessary in order for it to prove its case. That is not the case whatsoever, Your Honor. We submit that the district court properly held that due to the vast dissimilarity of the trade dress as found during the likelihood of confusion analysis, the dilution claim failed as district courts or the Northern District of Georgia held in Darden Restaurants v. Wilson Hall. Similarity of the marks or the trade dress here is an essential element of a claim for a statute. So, unless you have any further questions, I will burden the Court's time no longer, and I happily yield to Mr. Jones. Thank you. Thank you. Mr. Jones, four minutes. Thank you, Your Honor. May it please the Court, just a couple points. First of all, regarding the inference of not having a survey, Your Honor, the case law on summary judgment, the summary judgment standard says that all inferences, all reasonable inferences have to be drawn in JB Weld's favor. And so, to draw an inference that the lack of a survey means that there is no confusion would be an inference drawn in favor of Gorilla Glue and not in favor of JB Weld. Now, you asked about the V-shape. The V-shape is not present on any other company's packaging. The only two companies that use a V-shape are Gorilla Glue and JB Weld. And JB Weld has used a V-shape on its packaging and advertising materials. You're talking about adhesive companies, right? Yes, Your Honor, of course. Yes. Yes. Adhesive companies. Is there any evidence about non-adhesive? I'm inadvertently into repair business, owning a home, and I've purchased things you've mixed together before. Yes, Your Honor. And I can't recall seeing that in any. Is there any evidence in this record about non-adhesive company, the V-shape? We know, Your Honor. When you have to mix things together. No, Your Honor. Not. And things other than epoxies are, in fact, mixed together. Other adhesives. Yeah, but a lot of those are bottles, little bottles, and you don't want to turn those upside down all the time. That's exactly right, Your Honor. And sometimes they come in syringes. Both Gorilla Glue and JB Weld have a syringe product that is not in two separate tubes, and you mix those together. Your Honor, an interesting point was somebody asked about the drop-down information box in the middle. Well, interestingly, in Gorilla Glue's brief, they admit that this is the first time they've ever done anything like that. In fact, in their brief at page three, they say that in addition to the Gorilla Glue mark in orange color, Gorilla Glue also consistently utilizes informational bubble icons. All right? Not a drop-down information box, but if you go to their brief and look at their other packaging, you'll see that they use bubble icons instead of this drop-down information box. The only reason they use the drop-down information box is because their designers were instructed to mirror and mimic and get, quote, as close to JB Weld, close quote, as possible. And that's exactly what they did here. They were successful in getting as close as possible. They didn't use those bubbles. Why didn't they use bubbles, even though they say they consistently use bubbles? Well, they don't. All right. Also, Your Honor. But looking at, we're looking at likelihood of confusion here and looking at the two products, why isn't that the, and this is what the district court was focusing on, the color scheme. And there's a, I mean, that's a dramatic difference in the color scheme. Why doesn't that really carry the day in the balancing? Because Your Honor, just as the restatement of unfair competition says, in this particular case, the use of different names and logos and colors actually increases the likelihood of confusion, of affiliation confusion. That's exactly what Loctite and O'Reilly's auto parts assumed. They assumed that there was some kind of relationship between JB Weld and Gorilla Glue with respect to the Gorilla Weld product. I hadn't seen the restatement, but the idea that if you use different colors, there's an increased likelihood of confusion as opposed to using the same colors is absurd. No, Your Honor. That's not what the restatement says. I believe that was what you said, but repeat it so I'll- Okay, what the restatement specifically says is that in some instances, the use of names and logos actually can increase the likelihood of affiliation confusion. But Judge Branch's question was about the colors. Yes, Your Honor, and that goes to the origin. In other words, the fact that they use color schemes and logos that are different than the color schemes can actually increase the likelihood of confusion. That's a converse of what you argued. Well, Your Honor, if I argued that, then I apologize. What I meant to say was that the restatement says that in some instances, the use of identifiable names and identifying the seller of the product can actually increase affiliation confusion. The reason it does and can and does in this case is exactly demonstrated by what Loctite and O'Reilly's asked J.B. Weld. In other words, they know that the Gorilla Glue product is sold by Gorilla Glue. They know that the J.B. Weld product is sold by J.B. Weld, but O'Reilly's and Loctite believed or thought that there might be some business relationship, some affiliation between the two companies, and that J.B. Weld was making the product for Gorilla Glue because of the use of the term weld. No, Your Honor, because of, nobody knows, but it's the overall impression of the infringing trade dress. It's a holistic, and you're right, it's not a bright line rule. You said the use of product names, now I heard you that time. Yes, Your Honor. You said the use of product names can actually increase the risk of confusion, and I ask you then, is that because of weld? And you said, no. No, Your Honor. It's because- Why use of product names here increases the likelihood of confusion? It's not the use of product name, it's use of the product source name. In other words, the trademark, what the restatement actually says, I believe, is the trademark owner's name and logo. In this case, it's trade dress, so it's the trade dress owner's name, Gorilla, and it's logo and color scheme. So the use of Gorilla increased the risk of confusion with J.B. Weld? No, Your Honor. The use of Gorilla, and the use of the Gorilla logo, and the use of the color scheme, the orange color scheme, that Gorilla Glue uses on all of its products, increases the affiliation confusion because a consumer is going to know that this product, the origin of the source, the source of the product, is Gorilla Glue. But that's only part one of the Lanham Act likelihood of confusion. Part two is, is there an affiliation, an association, a connection confusion between Gorilla Glue on one hand and J.B. Weld on the other? And that's exactly what occurred here. So if Gorilla Glue had used something other than the term Gorilla Glue, Gorilla Weld, it would have decreased the confusion? You just said that using the name increases the origin confusion. Your Honor, let me rephrase that. Use of identifying aspects or features to disclose the name of the seller, of the source of the product, whether it's name, whether it's logo, whether it's color, whatever it is, the consumer is going to know that this product comes from a certain person. In other words, this product comes from Gorilla Glue. Nobody's going to dispute that J.B. Weld sells this product. Okay. Four minutes over, we'll take the case under submission. Thank you, Your Honor. Next one up is Brinson v. Providence Community.